**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN M. LINHART, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-530 |
| | ) | Judge Nora Barry Fischer |
| ZITELLI & BRODLAND, P.C. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

In this employment discrimination action, Plaintiff Steven M. Linhart ("Plaintiff") alleges that he was terminated by Defendant Zitelli & Brodland, P.C. ("Defendant") in violation of the Americans With Disabilities Act, of 1990, as amended, 42 U.S.C. § 12101, et seq. ("ADA"). (Docket No. 1). Plaintiff claims that he was terminated from his position as a histology[1] technician ("histotech") shortly after disclosing to his employer that he was diagnosed with avascular necrosis[2] and was in need of hip replacement surgery. (*Id.*). Presently before the Court is Defendant's motion for summary judgment. (Docket No. 26). Defendant maintains that Plaintiff was discharged from his brief stint as a histotech for performance reasons and argues that he has failed to present any evidence supporting his claim of discrimination, and, alternatively, that Plaintiff is not entitled to back pay or front pay as to his discrimination claim if it survives summary judgment. (*Id.*). Upon consideration of the parties' submissions, and for the following reasons, Defendant's motion for summary judgment [26] is DENIED.

---

[1]     "Histology" is "[t]he science concerned with the minute structure of cells, tissues, and organs in relation to their function." STEDMAN'S MEDICAL DICTIONARY at 183510 (27th ed 2000); *see also* § II.B, *infra*.

[2]     "Avascular necrosis" is defined as "pathologic death of one or more cells, or of a portion of tissue or organ" "due to deficient blood supply." STEDMAN'S MEDICAL DICTIONARY at 269300 (27th ed. 2000); *see also* § II.E, *infra*.

## II.  FACTUAL BACKGROUND

The following facts were compiled from the parties' submissions pursuant to Local Rule 56.  Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to Plaintiff, they are as follows.

### A.  Plaintiff's Educational Background and Prior Work History

Plaintiff is both a high school and college graduate as he earned a Bachelor of Arts degree in History in 2001.  (Docket No. 34).  He worked as an emergency medical technician for Elizabeth Township from 2001 to June 30, 2008.  (*Id.*; Docket No. 31-2 at ¶¶ 1, 8).  He attained the position of "Captain" with Elizabeth Township but sought other work because that position did not present him with any opportunity for further advancement.  (*Id.*; Docket No. 34).  As a consequence, he applied for a position as a histotech with Defendant in June of 2008.  (*Id.*).

### B.  Zitelli & Brodland

Defendant is a medical practice established in 1987 by Dr. John A. Zitelli ("Zitelli") and Dr. David G. Brodland ("Brodland").  (Docket Nos. 29 at ¶¶ 1, 9; 32 at 1).  Both Zitelli and Brodland are dermatologic surgeons whose practices focus on skin cancer surgery, particularly advanced treatment procedures such as Mohs surgery.[3]  (*Id.*).  Their medical practice "functions as a Mohs surgery training center and is accredited by the American Council for Graduate Medical Education."  (Docket Nos. 29 at ¶ 1; 32 at 1).  Defendant operates out of two Pittsburgh-based facilities, i.e., the Shadyside Medical Building and the Jefferson Regional Medical Center.  (Docket Nos. 29 at ¶ 10; 32 at 1).

---

[3]   The parties agree that "Mohs surgery … offers the highest potential for recovery even if it has been previously treated.  The cure rate for Mohs surgery is the highest of all treatments for skin cancer -- up to 99% even if other forms of treatment have failed."  (Docket Nos. 29 at ¶ 2; 32 at 1).

Defendant employs histotechs at these locations to assist the surgeons with Mohs surgery and other procedures. (Docket Nos. 29 at ¶ 4; 32 at 1). Eric Stein ("Stein") was hired by Defendant as a histotech in May of 1997. (Docket Nos. 29 at ¶ 12; 32 at 1). Stein has been Defendant's Chief Histotech throughout the pendency of this lawsuit. (Docket Nos. 29 at ¶ 11; 32 at 1). In this role, Stein is responsible for recommending the hiring and retention of laboratory staff, including histotechs and for the training and development of these employees. (*Id.*). Thus, Stein was Plaintiff's immediate supervisor. (Docket Nos. 29 at ¶ 16; 32 at 1).

As noted, Mohs surgery is an advanced skin cancer treatment procedure. (Docket Nos. 29 at ¶ 2; 32 at 1). In this procedure, the surgeon excises the visible tumor from a patient, by removing layers of skin tissue which are then color coded and mapped. (Docket Nos. 29 at ¶¶ 2-3; 32 at 1). After removal, the tissue is provided to the histotech, whose role is to take the tissue, freeze it in a cryostat, mount it in the cryostat, accurately cut very thin sections in the tissue, mount it on a slide and stain it so that the surgeon is able to read the slide under a microscope and determine if cancerous cells remain. (Docket Nos. 29 at ¶¶ 3-5; 32 at 1). This procedure "relies on the accuracy of a microscope to trace and ensure removal of skin cancer down to its roots. This technique allows the surgeon to see beyond the visible disease, and to precisely identify and remove the entire tumor, leaving healthy tissue unharmed." (Docket Nos. 29 at ¶ 2; 32 at 1). The entire process takes approximately one day to be completed. (Docket Nos. 29 at ¶ 8; 32 at 1).

The surgeon therefore relies on the accuracy of the histotech's cuts of the tissue and preparation of the slides. (Docket Nos. 29 at ¶ 6; 32 at 1). If the tissue is incorrectly placed on the slides, the surgeon would examine the wrong side of the tissue. (*Id.*). Or, if there are errors in the cuts made by the histotech, that portion of tissue becomes unusable, requiring the surgeon

to restart the entire process, including performing further surgery to excise additional layers of the patient's skin. (*Id.*).

### C. Plaintiff's Employment at Zitelli & Brodland

As noted, Plaintiff submitted a formal application to Defendant wherein he disclosed that he had "back issues" but no other medical issues. (Docket Nos. 34; 29 at ¶ 13; 32 at 1). Plaintiff was also interviewed by Stein and Zitelli and questioned about his "back issues." (Docket Nos. 29 at ¶¶ 13-15; 32 at 1). In response, Plaintiff advised that his "back issues" would not limit his ability to perform the duties required in the histotech position. (*Id.*). Plaintiff was hired on June 30, 2008 and he started work immediately. (Docket Nos. 29 at ¶ 15; 32 at 1).

The parties have presented widely divergent evidence regarding Plaintiff's performance as a histotech for Defendant. (Docket Nos. 29 at ¶¶ 17-32; 32 at § C, p. 1-4). The parties agree that it is very difficult for a histotech to become proficient in cutting tissue and preparing slides as required in the Mohs procedure. (Docket No. 31-4, *Zitelli Depo*, at 9, 17). Plaintiff states that he spent the first two weeks of his job simply observing other histotechs cut tissue and prepare slides. (Docket No. 31-2 at ¶ 12). He then trained by cutting tissue on practice slides for some time. (*Id.* at ¶ 13). Plaintiff admits that his slides were "not perfect" at the beginning of his employ. (*Id.* at ¶ 14). However, he claims that everyone understood that there was a steep learning curve in the position and that he received positive encouragement and support from Stein and Brodland. (*Id.* at ¶ 15). But, he states that he progressed to the point where he was successfully working with real tissue from patients toward the end of his short tenure with Defendant. (*Id.* at ¶ 16).

On the other hand, Defendant states that Plaintiff's performance was poor. Specifically, Zitelli testified that he perceived Plaintiff as having a bad attitude and also stated that he seemed

disinterested in learning histopathology.[4]  (Docket No. 29 at ¶ 19).  Zitelli did not believe that Plaintiff spent enough time practicing the procedure.  (*Id.* at ¶ 20).  He testified that the quality of Plaintiff's work was poor and that he consistently produced slides which were incomplete or torn, requiring him to redo them.  (*Id.* at ¶ 17).  Zitelli did not believe that Plaintiff was making sufficient progress and discussed his performance with Stein, suggesting on more than one occasion that they should let Plaintiff go rather than continuing to employ him as a histotech.  (*Id.* at ¶ 31).  Stein, however, convinced Zitelli on at least two occasions that they should keep Plaintiff on and continue to attempt to train him.  (*Id.* at ¶ 31).

The parties agree that Defendant had certain workplace rules in place to which Plaintiff was subject.  (Docket Nos. 29 at ¶¶ 21, 25-26; 32 at 2-3).  Defendant claims that Plaintiff broke several of these rules during his employment and was verbally reprimanded for his rule violations.  (Docket No. 29 at ¶¶ 22-24, 27-32).  Plaintiff disputes that he broke the cited rules.  (Docket No. 32 at 3-4).  But it is undisputed that Defendant issued no written reprimands to Plaintiff and has not maintained any written documentation of the alleged verbal reprimands that were given.  (Docket No. 31-2 at ¶¶ 19-21).

To this end, all of Defendant's employees were required to follow Universal Precautions safety procedures,[5] including that "any blood or bodily fluid of any patient is assumed or presumed to be infected with either AIDS or hepatitis" and should be handled accordingly.  (Docket Nos. 29 at ¶ 26; 32 at 2).  Zitelli testified that Plaintiff consistently refused to follow these procedures for working with blood-borne pathogens.  (*Id.* at ¶ 27).  For example, he stated that Plaintiff often failed to take his gloves off while getting coffee and wore dirty gloves while

---

[4]      "Histopathology" is defined as "[t]he science or study dealing with the cytologic and histologic structure of abnormal or diseased tissue."  STEDMAN'S MEDICAL DICTIONARY at 183620 (27th ed. 2000).

[5]      "Universal Precautions are safety procedures established by the Centers for Disease Control and Prevention and the American Dental Association to prevent the transmission of infectious diseases to patients and health care workers in medical and dental offices."  (Docket Nos. 29 at ¶ 25; 32 at 2).

retrieving files and handling coffee cups. (*Id.* at ¶¶ 28, 29). Likewise, Stein testified that Plaintiff would take frequent coffee breaks and often take them in the middle of a procedure. (*Id.* at ¶ 30). Plaintiff admits that on one occasion he was advised by a co-worker not to drink coffee while wearing medical gloves but denies that he generally failed to follow Universal Precautions. (Docket No. 31-2 at ¶ 20, 24, 27). Plaintiff also claims that it would be "impossible" to take a coffee break in the middle of a procedure. (*Id.* at ¶ 25).

In addition, smoking is prohibited on the grounds at both the Shadyside and Jefferson Hospital locations. (Docket Nos. 29 at ¶ 21; 32 at 2). Defendant claims that Plaintiff was reprimanded for smoking on the grounds. (*Id.* at ¶ 22). Plaintiff denies that he was ever reprimanded for smoking but admits that on one occasion a co-worker told him that smoking was not permitted on the grounds. (Docket No. 31-2 at ¶¶ 20, 23). Stein also testified that Plaintiff arrived at work late on two occasions and verbally reprimanded him for doing so. (Docket No. 29 at ¶¶ 23, 24). Plaintiff denies that he was ever late or reprimanded for tardiness. (Docket No. 31-2 at ¶ 29).

### D. *Decision to Terminate Plaintiff*

Zitelli and Stein testified that they decided to terminate Plaintiff during a meeting at the Shadyside office on August 18 or 19, 2008. (Docket No. 29 at ¶ 33). They planned to inform Plaintiff of their decision on the afternoon of August 20, 2008 when all of them would be at the Jefferson Medical Center location at the same time. (Docket No. 29 at ¶¶ 33, 34). Zitelli explained that the termination meeting would be held in the afternoon on August 20 because mornings were typically very busy at the lab. (*Id.* at ¶ 36). Plaintiff testified that he was unaware that Zitelli and Stein had such a meeting or that they had decided to terminate him prior to August 20, 2008. (Docket No. 29 at ¶ 37).

### E. Plaintiff's Hip Ailment

On August 19, 2008, Plaintiff was diagnosed with avascular necrosis[6] by his physician, Dr. Habib, and was advised that this condition required hip replacement surgery. (Docket No. 31-2 at ¶ 48). Dr. Habib explained to him that this ailment was caused by a loss of blood to his hips. (*Id.*). Plaintiff advised Stein of his need for hip replacement surgery the following morning, August 20, 2008. (Docket Nos. 29 at ¶ 38; 32 at 4). From Plaintiff's view, Stein was supportive and encouraging. (Docket No. 31-2 at ¶¶ 49, 50). Plaintiff states that he also told Zitelli that he was in need of hip surgery that morning but could not recall if he advised him of his specific diagnosis of avascular necrosis. (*Id.* at ¶¶ 52, 53). Plaintiff further states that upon hearing this news, Zitelli did not say anything to him but turned in disgust and walked away from him. (Docket No. 31-2 at ¶¶ 52). In contrast, Zitelli testified that Plaintiff only told him on the morning of August 20, 2008 that he had a problem with "water on his leg" or "water on his thigh" and did not mention a need for surgery. (Docket No. 29-2, *Zitelli Depo*, at 14). Zitelli also testified that Plaintiff's disclosure "meant absolutely nothing to him." (*Id.*).

### F. August 20, 2008 Meeting

On the afternoon of August 20, a meeting was held between Zitelli, Stein, Office Manager Donna Latterio and Plaintiff at the Jefferson Medical Center office. (Docket Nos. 29 at ¶ 41; 32 at 4). At the meeting, Zitelli informed Plaintiff that he was not catching on and that they made a decision to discontinue his training. (Docket No. 29 at ¶ 42). Plaintiff testified that Zitelli told him during the meeting that he "was not a good long term investment." (Docket Nos. 29 at ¶ 43; 31-2 at ¶ 57). There was no mention of any of Plaintiff's medical problems during the meeting. (Docket No. 29 at ¶ 44; 32 at 5).

---

[6]     *See* n. 2, *supra*.

Plaintiff testified that he asked Zitelli and Stein for an explanation during the meeting but was not provided with a reason for the termination at that time. (Docket No. 31-2 at ¶ 58). After the meeting concluded, Plaintiff sought out Stein for an explanation and asked whether he was fired for his performance. (*Id.* at ¶ 59). Plaintiff explained that Stein responded by shaking his head "no" and walking away. (*Id.*). Plaintiff further stated that Stein looked "very sad" and was crying during this exchange. (*Id.*).

### G. Defendant's Benefits Policies

Defendant's employee benefits policies provided that employees are eligible for one paid sick day per month and paid vacation days accrue at the rate of .83 days per month. Docket Nos. 29 at ¶¶ 48, 52; 32 at 5). However, the policies further provide that employees do not become eligible for paid sick days or vacation days until after 90 days of the start of their employment with Defendant. (Docket Nos. 29 at ¶¶ 49, 53; 32 at 5). Pursuant to these policies, Plaintiff would not have been eligible for vacation pay or sick pay until September 30, 2008 and also would not have been eligible for discretionary unpaid disability leave until December 30, 2008. (Docket Nos. 29 at ¶¶ 50, 54; 32 at 5). Thus, because Plaintiff had not accrued any vacation days or sick days, Defendant states that Plaintiff would have been subject to discharge if his surgery caused him to miss any work. (Docket No. 29 at ¶ 58).

### H. Plaintiff's Post-Termination Activities

Dr. Timothy Honkala, M.D. performed surgery on Plaintiff's right hip on September 12, 2008 due to Plaintiff's avascular necrosis. (Docket No. 31-2 at ¶ 62). When Plaintiff was discharged in August, his surgery had yet to be scheduled. (Docket No. 31-2 at ¶ 76). He testified that he was never advised that he was in "dire need" of immediate surgery. (*Id.*). However, Plaintiff scheduled his surgery quickly after his discharge because his ex-wife's health

insurance was about to expire.  (*Id*. at ¶ 77).  From Plaintiff's view, the surgery would not have interfered with his ability to work for Defendant.  (*Id*. at ¶ 80).  He explained in his affidavit that if he had remained an employee with Defendant, he would have had options in that he could have postponed the surgery until after he had accrued vacation and sick days on September 30, 2008 or, possibly another six months until he was eligible for discretionary disability leave.  (*Id*. at ¶¶ 78-80).

Plaintiff admits that after his surgery he did not actively search for a new career for a period of approximately 5-7 months.  (*Id*. at ¶ 66).  During this time, he did not actively search newspapers or websites for open positions but also did not decline any employment opportunities.  (*Id*. at ¶ 67).  Plaintiff explains that he felt depressed due to his medical condition, his alleged unfair discharge, "the unexpected end to a hopeful career path, and the loss of [his] income and benefits at a time when [he] needed them for surgery."  (*Id*. at ¶ 68).

But, Plaintiff was able to "get back on his feet" and attain employment as a counselor for the mentally challenged at Mon Yough Community Services in McKeesport, Pennsylvania.  (*Id*. at ¶ 70).  He started with Mon Yough in this position on September 30, 2009 and remains employed there.  (*Id*.).  However, Plaintiff earns less in salary and benefits in this new position and, thus, continues to lose money and benefits as a result of the alleged unlawful termination by Defendant.  (*Id*. at ¶ 72).

Dr. Honkala performed a second hip replacement surgery on Plaintiff's left hip on October 28, 2010 as a result of his avascular necrosis.  (*Id*. at ¶ 63).  Plaintiff stated that his doctors have explained to him that his disease is permanent.  (*Id*. at ¶ 65).  Plaintiff testified that this condition continues to affect his ability to walk, stand for long periods of time and sleep comfortably.  (*Id*. at ¶¶ 65, 73).  However, Plaintiff believes that despite his disease, he could

perform the essential functions of the histotech position today because that position involved sitting at instruments and completing tasks that he could perform with few exceptions. (*Id.* at ¶ 74).

## III. PROCEDURAL HISTORY

Plaintiff filed his one count Complaint against Defendant on April 26, 2010, alleging that he was terminated by Defendant in violation of the ADA. (Docket No. 1). Defendant filed its Answer on September 23, 2010, denying liability. (Docket No. 4). The parties then proceeded to discovery, which was fully completed by February 25, 2011. (Docket No. 22). At that point, the parties advised this Court that further mediation[7] would not be fruitful and Defendant requested that a summary judgment scheduled be set. (*Id.*). The Court issued an Order setting forth summary judgment deadlines on February 25, 2011. (Docket No. 23). Both parties sought extensions of time from the deadlines that were initially set, which were independently granted by the Court. (*See* Docket Nos. 24, 25, 30, 31).

Defendant filed its motion for summary judgment, brief in support and concise statement of material facts on June 10, 2011. (Docket Nos. 26, 27, 29). Plaintiff filed his response in opposition, attachments and brief in opposition on July 14, 2011. (Docket Nos. 31, 32). Then, Defendant filed its reply brief and attachments on July 29, 2011. (Docket No. 33). Plaintiff did not file a sur-reply brief prior to the Court's deadline of August 5, 2011 and no other briefing has been received.[8] (*See* Docket No. 25). Therefore, the present motion is fully briefed and ripe for disposition.

---

[7] The parties participated in mediation before Arthur J. Stroyd, Esquire on December 21, 2010 pursuant to the Court's mandatory Alternative Dispute Resolution policies and procedures, but the case did not resolve at that time. (Docket No. 21).

[8] The Court notes that Defendant filed an "errata" version of its Exhibit D on July 29, 2011 (Docket No. 34) after the Court's staff advised counsel that the exhibit which was initially filed contained personal identifiers, i.e., Plaintiff's social security number, in violation of Local Civil Rule 5.2.D. W.D.Pa.LCvR. 5.2.D. The version

## IV. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) (2010).[9] Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)). In

---

containing Plaintiff's social security number was removed from public view on the Court's CM/ECF System by the Court's staff.

[9] Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute", the "standard for granting summary judgment has not changed." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motions. FED.R.CIV.P. 56; *Toney v. Bledsoe*, 427 Fed.App'x 74, n.5 (3d Cir. 2011) (not precedential) (same).

evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V.  DISCUSSION

Defendant has set forth alternative arguments in its motion for summary judgment. (Docket No. 27).  First, Defendant contends that summary judgment is appropriate as to Plaintiff's ADA claim.  (*Id.*).  Second, Defendant maintains that if Plaintiff's ADA claim survives summary judgment, his potential equitable damages of back pay and front pay should be limited.  (*Id.*).  Plaintiff argues that summary judgment is not appropriate as to both liability and damages.  (Docket No. 31).  The Court will evaluate the parties' arguments as to each, in turn.

*A.  Plaintiff's Discrimination Claim*

The relevant portion of the ADA provides that an employer is prohibited from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to … discharge of employees."  42 U.S.C. § 12112(a) (2008).[10]  A "qualified individual with a disability" includes "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (2008).  The term "disability" encompasses any of the following:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; **or**

---

[10]  All of the events at issue in this case occurred in 2008 before the ADA Amendments Act of 2008 ("ADAAA") became effective on January 1, 2009.  Pub.L.No. 110-35, 122 Stat. 3553 (2008).  Courts have uniformly held that the ADAAA does not apply retroactively.  *See Britting v. Secretary, Dept. Of Veteran Affairs*, 409 Fed.App'x 566, 569, n.3 (3d Cir. 2011) (not precedential) (citing precedent from the 1st, 2nd, 5th, 6th, 7th, 8th, 9th, and D.C. Circuits).  Therefore, the Court will apply the law in effect at the time of the events in question.

(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1) (2008) (emphasis added).

Discrimination claims brought under the ADA are evaluated under the familiar *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *E.E.O.C. v. Hussey Copper, Ltd.*, 696 F.Supp.2d 505 (W.D.Pa. 2010) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999)) (applying the *McDonnell Douglas* framework to analyze ADA claims). Under *McDonnell Douglas*, Plaintiff has the initial burden to establish a prima facie case of discrimination. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). If Plaintiff establishes a prima facie case, the burden shifts to Defendant "to advance a legitimate, non-discriminatory reason" for its employment decision and, if Defendant is successful, the burden shifts back to Plaintiff to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for discrimination. *Id.*

Here, Defendant challenges Plaintiff's prima facie case and further contends that Plaintiff has failed to adduce any evidence of pretext which would undermine its alleged legitimate non-discriminatory reason for its decision to terminate Plaintiff for performance reasons. (Docket No. 27). In response, Plaintiff maintains that he has presented sufficient evidence to raise genuine disputes of material fact which preclude summary judgment in this case. (Docket No. 31). The Court agrees with Plaintiff that this case is not amenable to summary judgment as genuine disputes of material facts exist which must be resolved by a jury.

a. Plaintiff's Prima Facie Case

"To establish a prima facie case of discrimination, a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or

without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999)).  Defendant only challenges the first prong of Plaintiff's prima facie case; thus, the Court need not consider whether Plaintiff was qualified for the position he formerly held with Defendant or if his termination from that position constitutes an adverse employment action.  (*See* Docket No. 27).

Defendant's argument as to the first prong is easily disposed of.  Defendant concedes for purposes of its present motion for summary judgment that Plaintiff has avascular necrosis, making him disabled under the ADA.[11]  (*Id.*).  Despite these concessions, Defendant argues that Plaintiff was not "regarded as" disabled by his employer.  (*Id.*).  But, an individual is disabled under the ADA if he: (1) has an impairment "which substantially limits one or more major life activities of such individual"; (2) has a record of a disability; **or** (3) is "regarded as" disabled by his employer.  42 U.S.C. § 12102(1) (2008) (emphasis added).  Hence, an individual is considered disabled if the requirements of any of the three alternative subcategories set forth in section 12102(1) are met.  To this end, the United States Court of Appeals for the Third Circuit has recognized that "[b]ecause the ADA lists the three subcategories in the disjunctive[;] a plaintiff must only show that he is disabled under one of the three subparts to establish the first element of a prima facie disability discrimination case." *Walsh v. Bank of America*, 320 Fed.App'x. 131, 132-133 (3d Cir. 2009) (not precedential) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

---

[11]     The Court notes that Defendant's concession that Plaintiff is disabled appears in numerous instances throughout its submissions.  First, Defendant argues that "[e]ven assuming for purposes of this Motion only that [Plaintiff] can establish that he was disabled, he cannot establish that he was regarded as disabled." (Docket No. 27 at 3-4).  Later, Defendant contends that "[e]ven assuming for the sake of summary judgment only that Linhart could establish that he was both disabled and regarded as disabled ..." (Docket No. 27 at 5).  "Finally, he does have avascular necrosis; thus the third prong does not apply." (Docket No. 27 at 5).

Given this precedent, based on Defendant's agreement for the purposes of summary judgment that Plaintiff is disabled under the ADA, Plaintiff has established this element of his prima facie case and no further discussion of his alternative theory that Defendant regarded him as disabled is necessary. *See Jacoby v. Bethlehem Suburban Motor Sales*, 2011 WL 1884015, at *7, n.8 (E.D. Pa. May 17, 2011) ("Here, Plaintiff is proceeding under both an "actual disability" theory and a "regarded as" theory. Since Defendant has conceded that Plaintiff has an actual disability, the Court need not differentiate between the two theories for purposes of this motion."). Therefore, Defendant's motion for summary judgment is denied to the extent it argues that Plaintiff has failed to meet his burden of production to set forth sufficient evidence of his prima facie case.

### b. Defendant's Legitimate Non-Discriminatory Reasons for Terminating Plaintiff

Since Plaintiff has met his burden of production, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its decision to terminate Plaintiff. The burden placed on an employer to articulate a legitimate non-discriminatory reason for its employment action is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). Indeed, "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. Here, Defendant has met its burden of production as it has produced evidence that Plaintiff was terminated because he: was a poor employee who was unable to master and/or show sufficient progress that he would be able to master the difficult Mohs procedure; was disinterested in his work and had a poor attitude; failed to follow Universal Precautions safety procedures; smoked cigarettes on the premises of the non-smoking medical facility; and, showed up late for work on two occasions. (Docket No. 29 at ¶¶

17-32). An employee's alleged poor work performance and failure to follow work rules certainly are legitimate non-discriminatory reasons for an employer to terminate an employee. *See e.g., Wooler v. Citizens Bank,* 274 Fed.App'x 177, 180 (3d Cir. 2008) ("Here, the District Court properly found that though Wooler established a prima facie case, there was a legitimate, nondiscriminatory reason for Wooler's firing-her poor performance."); *Scully v. Allegheny Ludlum Corp.*, 257 Fed.App'x 535, 537 (3d Cir. 2007) (discharge for performance reasons and discipline legitimate non-discriminatory reasons for termination); *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998) (poor performance of an employee a legitimate non-discriminatory reason for termination). Thus, considering the evidence of record, Defendant has met its burden under *McDonnell Douglas* to proffer legitimate non-discriminatory reasons for its termination decision.

c. Plaintiff's Evidence of Pretext

In order to overcome Defendant's proffered legitimate non-discriminatory reasons for its termination decision, the burden shifts to Plaintiff to prove by a preponderance of the evidence that such action was a pretext for discrimination. To meet his burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

> The plaintiff can discredit the proffered reasons by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." Alternatively, to show that discrimination was the likely cause of the adverse action, a

> plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to "unlawful discriminatory treatment," that it had "treated other, similarly situated persons not of his protected class more favorably," or that it had "discriminated against other members of his protected class or other protected categories of persons."

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d at 764-65).

Further, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, [...] was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal citations omitted). Plaintiff is not required to cast doubt on each of the proffered reasons in a vacuum, but "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Id.* at 764, n. 7. To this end, "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir.2006) (citing *Fuentes*, 32 F.3d at 764, n. 7).

In this Court's estimation, viewing the evidence in the light most favorable to Plaintiff, as this Court must, Plaintiff has met his burden to present evidence of pretext as he has adduced evidence from which a reasonable jury could find in his favor on his discrimination claim and disputed factual issues also remain which otherwise preclude summary judgment in favor of Defendant.

Defendant's primary contention with respect to this case is that the decision to terminate Plaintiff was made by Stein and Zitelli at a meeting held on August 18 or 19, 2008 – prior to

Plaintiff's disclosure to them that he had avascular necrosis and was in need of hip surgery on August 20, 2008 and the day that he was fired. (Docket No. 27). Defendant reasons that if Stein and Zitelli did not know of Plaintiff's ailment on the day they made the decision to fire Plaintiff, then they could not have fired him for discriminatory reasons. *Cf. McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."). As a consequence, Defendant maintains that the Court should accept its proffered reasons for terminating Plaintiff, i.e., his poor performance and violations of workplace rules, and grant summary judgment in its favor. (Docket No. 27). However, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable jury could discredit Defendant's stated reasons for its termination decision and doubt Stein and Zitelli's assertions that the termination decision was made prior to Plaintiff's disclosure of his ailment to them.

To this end, the timing between Plaintiff's disclosure of his avascular necrosis to Stein and his need for hip surgery to both Stein and Zitelli on the morning of August 20, 2008 and Zitelli and Stein's termination of Plaintiff later the same afternoon is sufficient to raise an inference of discrimination. "Timing is […] a factor to be considered in a pretext analysis, and can be suggestive of discrimination." *Anderson v. Radio One, Inc.*, 2010 WL 3719088, at *10 (E.D.Pa. Sept. 20, 2010) (citing *Walton v. Mental Health Ass'n of Southeast Philadelphia*, 168 F.3d 661, 669 (3d Cir. 1999)); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638-39 (3d Cir. 1993) ("On different occasions, this court has found that factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer

inappropriate."); *Fuentes*, 32 F.3d at 766 (noting that "the timing of events which can give rise to an inference of improper motivation" will establish pretext). However, "[t]o consider timing ... in relation to dismissal as evidence of discrimination, there must be some logical connection between the timing or treatment and the possibility of the particular discrimination at issue." *Walton*, 168 F.3d at 669.

Here, there is a logical connection between Plaintiff's disclosure of his hip condition and Defendant's almost immediate termination of Plaintiff a few hours later,[12] which raises a reasonable inference of discrimination. *See Anderson*, 2010 WL 3719088, at *11 (holding that three weeks between disclosure of ailment and termination not suggestive of discrimination). In addition, Plaintiff testified that Zitelli was visibly upset after the hip ailment was disclosed to him – which contradicts Zitelli's testimony that he was only told by Plaintiff that he had "water on his hip" or "water on his thigh" and that this disclosure "meant absolutely nothing to him." (Docket Nos. 31-2 at ¶¶ 52-53; 29-2 at 14). Then, a very short time after Plaintiff's disclosure; he was terminated and told by Zitelli that he "was not a good long term investment." (Docket Nos. 29 at ¶ 43; 31-2 at ¶ 57). Subsequent to the meeting, Plaintiff approached Stein, who allegedly told him that he was not fired for performance reasons. (Docket No. 31-2 at ¶ 59). Plaintiff further testified that Stein was upset and crying during this conversation – a reaction which reasonably suggests that Stein disagreed with the decision to fire Plaintiff. (*Id.*). If believed, these facts support Plaintiff's position that he was discharged for discriminatory reasons unrelated to his performance.

On the other hand, both Stein and Zitelli provided completely different accounts of these events during their testimony. Instead, they denied that Plaintiff was discharged for

---

[12]     The record does not disclose the precise time frame but, considering the other facts of record, it could not have been more than a few hours between the disclosure and the termination meeting.

discriminatory reasons and explained that Plaintiff was discharged because of performance problems and his failure to follow simple workplace rules. (Docket No. 29 at ¶¶ 17, 19-20, 22-24, 27-32). They believed that he was not progressing as a histotech and, thus, it was no longer a good investment for the practice to continue to pay to train him. (*Id.* at ¶ 31).

Stein and Zitelli also testified that they made the decision to fire Plaintiff prior to him disclosing his ailment to them. (*Id.* at ¶ 33). But, their testimony was inconsistent as to when this meeting between them took place – Stein said on Monday, August 18, 2008, while Zitelli stated that it was that Monday or Tuesday, August 19, 2008. (*Id.*). Defendant also offers no corroborating evidence beyond the testimony of Zitelli and Stein to substantiate their claim that they made the decision to fire Plaintiff before they were advised of his ailment. (*Id.*). Indeed, the facts show that only Stein and Zitelli were present during the earlier meeting and there is no written documentation confirming the existence of the meeting or the substance of what was discussed at that time. (*Id.*). They also did not disclose to Plaintiff when they made the decision to terminate him during the August 20 meeting. (*Id.*). Thus, because there is no corroborating evidence and Defendant relies only on Stein and Zitelli's testimony, their credibility is squarely at issue regarding when the termination decision was made. *See Josey*, 996 F.2d at 638-39 ("this court has found that factors such as the defendant's credibility …, could raise an inference of pretext which would make summary judgment for the employer inappropriate."). In this Court's opinion, considering all of this evidence (or lack thereof), a reasonable jury could reject Zitelli and Stein's testimony and conclude that the decision to terminate Plaintiff prior to his disclosure of his disability is merely a post hoc fabrication supporting their termination decision rather than the true facts of Plaintiff's discharge. *See Anderson*, 621 F.3d at 277 (quoting *Fuentes*, 32 F.3d at 764-65).

The parties have also presented conflicting evidence regarding whether Plaintiff violated certain workplace rules which likewise precludes the Court from entering summary judgment in favor of Defendant. Defendant provides that Plaintiff was late on a number of occasions without any excuse and failed to follow proper procedures, including smoking on the premises and wearing his gloves while taking coffee breaks. (Docket No. 29 at ¶¶ 23, 24, 27-30). Plaintiff claims that these proffered reasons for his discharge are overstated and denies that many of the proffered incidents ever occurred. (Docket No. 31). He testified that he was never formally disciplined, verbally or otherwise, by his superiors and admits only that a co-worker advised him against smoking on the grounds a single time and later advised him to remove his gloves prior to getting coffee. (Docket No. 31-2 at ¶¶ 20, 23, 29). Given these disputes, which are material to several of Defendant's proffered reasons for its termination of Plaintiff, summary judgment is not appropriate.

Finally, genuine issues of material fact also remain with respect to Plaintiff's performance as a histotech for Defendant. Defendant argues that it is inappropriate for the Court to consider Plaintiff's statements regarding his own performance to create a genuine issue of material fact sufficient to defeat summary judgment. (Docket No. 27). Defendant takes the position that Plaintiff's subjective belief of his own performance is not relevant to the Defendant's decision to terminate Plaintiff. (*Id.*). However, Defendant's argument is not supported by the record evidence in this case.

Here, Plaintiff testified not only regarding his self-evaluation of his performance, but also explained that he received positive feedback about his work performance from his supervisor, Stein, and the owners of the medical practice, Zitelli and Brodland. (Docket No. 31-2 at ¶¶ 35, 37-38). To this end, Zitelli and Stein told Plaintiff that he was "improving" and Brodland

advised him that he was "ahead of the curve." (*Id.*). These statements by Plaintiff's superiors about his work performance constitute admissions by Defendant and would be admissible at trial under Rule 801(d)(2)(D) of the Federal Rules of Evidence. *See* Fed.R.Evid. 801(d)(2) (a statement is not hearsay and, thus admissible, if it "is offered against a party and is "(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). Therefore, the statements may be considered at summary judgment and will not be disregarded at this stage as Defendant suggests. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (noting that evidence admissible under Rule 801(d)(2) may be considered at summary judgment). As this evidence concerning Plaintiff's work performance contradicts much of the evidence submitted by Defendant to the contrary, genuine issues of material fact are present sufficient to defeat Defendant's motion for summary judgment.

In sum, viewing the facts in the light most favorable to Plaintiff, the Court finds that there are triable issues of material fact regarding when the decision to terminate Plaintiff was made by Zitelli and Stein and whether they terminated Plaintiff for discriminatory reasons rather than the legitimate non-discriminatory reasons proffered by Defendant. On summary judgment, "[t]he court may not […] weigh the evidence or make credibility determinations as 'these tasks are left for the fact-finder.'" *Pichler v. UNITE*, 542 F.3d 380, 386, 542 F.3d 380 (3d Cir. 2008) (*Pertruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Therefore, because genuine factual issues remain which must be resolved by a jury, Defendant's motion for summary judgment as to Plaintiff's claim that it terminated him in violation of the ADA is denied.

B.  *Plaintiff's Request for Back Pay/Front Pay*

Alternatively, Defendant contends that Plaintiff is not entitled to back pay or front pay as to his discrimination claim. (Docket No. 27). Defendant argues that Plaintiff failed to mitigate his damages and is not entitled to front pay because his disability rendered him unable to work. (*Id.*). Plaintiff argues that Defendant's motion is premature and further maintains that genuine issues of material fact preclude summary judgment on his requests for back pay and front pay. (Docket No. 31). The Court agrees with Plaintiff's position that the instant motion is premature.

"A chief remedial purpose of employment discrimination statutes such as the ADA is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'" *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 440 (3d Cir. 2009) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). And, "Congress armed the courts with broad equitable powers to effectuate this 'make whole' remedy." *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 440 (3d Cir. 2009) (citing 42 U.S.C. § 2000e–5(g)(1)). In this regard, back pay and front pay are "available to a successful Title VII plaintiff under the Civil Rights Act of 1964." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006) (citing 42 U.S.C. § 2000e-5(g)(1)). Specifically, section 2000e-5(g)(1) of the Act provides that:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may … order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer … responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).[13] Back pay is meant to compensate an individual for lost wages between the discriminatory discharge and verdict and is determined by computing the "difference between the actual wages earned and the wages the individual would have earned in

---

[13]    The ADA incorporates the remedies provided under section 2000e-5(g)(1) of the Act. *See* 42 U.S.C. § 12117(a); *see also Eshelman*, 469 F.3d at 440, n.7.

the position that, but for the discrimination, the individual would have attained." *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1119 (3d Cir. 1988). With respect to front pay, the Court of Appeals has succinctly stated that:

> Though back pay makes a plaintiff whole from the time of discrimination until trial, a plaintiff's injury may continue thereafter. Accordingly, courts may award front pay where a victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied. Front pay is an alternative to the traditional equitable remedy of reinstatement, which would be inappropriate where there is a likelihood of continuing disharmony between the parties or unavailable because no comparable position exists.

*Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73, 86 (3d Cir. 2009) (internal citations omitted).

In this Court's estimation, Defendant's motion for partial summary judgment which seeks to limit Plaintiff's ability to potentially recover back pay and front pay is not yet ripe for adjudication. *See e.g., Joseph v. Access Data Corp.*, 2008 WL 2095200, at *23 (W.D. Pa. May 16, 2009) (holding that issues of back pay and front pay "are not ripe for adjudication" at summary judgment but rather could "be presented at trial or thereafter if Plaintiff is successful on the merits of her claims."); *Stager v. Beverly Health and Rehabilitation Services, Inc.*, Civ. A. No. 06-101, 2008 WL 3165837, at *21 (W.D. Pa. Aug. 6, 2008) (denying motion for summary judgment based on failure to mitigate damages, without prejudice); *Cook v. Brooks Sports, Inc.*, Civ. A. No. 07-172, 2009 WL 331551, at *7 (W.D. Pa. Feb. 11, 2009) ("However, [plaintiff's] alleged failure to mitigate would not warrant summary judgment."). For the issue of back pay or front pay to be ripe, Plaintiff must first successfully obtain a jury verdict in his favor on his discrimination claim. *See id.* At that point, the parties will be given the opportunity to present the Court with additional information pertaining to the equitable remedies of back pay and front

pay which was not presented to the jury and the Court will address these issues at that time.[14] Therefore, Defendant's motion for summary judgment is denied, without prejudice to Defendant's ability to raise the same arguments as to back pay and front pay at trial.

VI. CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment [26] is denied. An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date:   October 19, 2011

cc/ecf:  All counsel of record

---

[14]      The Court notes that a similar procedure was used by the District Court in *McKenna v. City of Philadelphia*, 636 F.Supp.2d 446 (E.D.Pa. 2009), upon which Defendant relies.  The *McKenna* decision on back pay and front pay was entered only after an eight-day jury trial resulted in a verdict in the plaintiff's favor and then a full hearing was held before the District Court regarding the plaintiff's equitable claims for back pay and front pay.  *Id.*